All right, our next case argument is 24-1496 Harris v. DOJ. Mr. Burns, please proceed. Please the court. We are here on a couple of things that I think are relevant to what happened here. The issue in this case is whether the administrative law judge in assessing evidence in a whistleblower case had substantial evidence that, two things, that the agency didn't take actions that were based on protected disclosures, and secondly, whether she applied the CAR factors appropriately in evaluating that evidence. I think it's important to focus on what was actually the fundamental issue that triggered what happened here. The DEA conducts polygraph examinations, and the bane of those examinations is when a polygraph examiner calls what's called countermeasures, in other words, measures that are designed to defeat the autonomic responses so that the test can be thwarted. As the evidence shows and was testified consistently, the DEA was the only agency that accepted significant responses and other things that agencies invalidate polygraph examinations. Brent Barnes, the former supervisor of the section, testified that there was heavy pressure at the highest levels of the agency to stop the calling of countermeasures in order to allow more applicants to come in and enter the ranks, that they had a shortage of people. My client's sin, as is consistent throughout this, because I think it's important to focus on this, is that she called countermeasures, and she called them with more frequency than others. As Brent Barnes says, she did more polygraphs than any other examiner. She got more admissions where people actually admitted that they had done something that would support the countermeasures, and she was in the most heavily trafficked section of the DEA in the Washington region. What is missing from the judge's decision is, the judge focuses heavily on this, and then I'll go back to the protected disclosure. The judge ignores the fact that it's not countermeasures that my client calls that would support a finding that she was doing something wrong and needing training. It was whether quality control confirmed those countermeasures. Under the DEA polygraph manual, when I take an examination, it cannot be final to two quality control individuals agree with its findings. Before we can ever get to whether she should have been sent for training, you have to demonstrate that there was a protected disclosure made prior to the request that she get training. A request for training is not generally a terrible thing. I mean, we can all use more training, but you seem to think it is. So what is the protected disclosure for which she was retaliated by being offered additional training? It wasn't just the training. I'm trying to lay the framework that the original problem she had was her calling the countermeasures. The initial protected disclosure she made was she recorded and got an admission of the following statement during a polygraph examination. I know the statement, and I know it's salacious and it's terrible, and I understand why it would have made her blood boil and made her want to do something about the statement. For sure, I get all that, so you don't need to talk nonsense with all of it, because we all read the facts and we know the facts, and she's good on her for wanting to do something to put a stop to what she learned in that polygraph, because that's just horrific, and nobody would disagree with that. But the question is, was the statement she made about that a protected disclosure such that when they asked her to go for this training, she was being retaliated? Yes. So what was the statement? Are you telling me when she said report it to OPR or COO, that was the protected disclosure? What was the protected disclosure particularly? So Judge Moore, the factual context in which the protected disclosure is made is she goes to Toomey and to Anessa McCaw-Daniels and says, I've had an admission of pedophilic activity, pedophile. No, you had an admission of thoughts. No, that's why I say it's important to the exact statement. It doesn't matter, irrelevant. But it wasn't about thoughts, it was about actual conduct. I didn't see that in the record, but move on. She did testify to that, that it was more than just thoughts. The thoughts language is interesting because she goes to Toomey and says, I've had this admission, we need to report this to OPR. And the manual says... No, she didn't say we have to report it to OPR. What did she say? Precisely, because it's in the record and everybody agrees. There's no dispute over what she told Toomey needed to happen. There's no dispute. This record is clear. Right, but you asked what... What did she say? What did she say to Toomey? She said it needs to be reported to OPR. Or the chief counsel's office. Well, she gave him two choices. She told her, she told her, because Toomey's a her. She told Toomey, this needs to be reported to either CCO or OPR. And what did Toomey do? She went to the chief counsel's office. To CCO. She did exactly what Ms. Harris told her needed to happen. It's not what Ms. Harris directs to her, it's what her obligation was. OPR itself came back to Toomey two days later and said, this is a criminal admission, you should have come to us. Now, that would trigger hostility from Toomey. And there's no evidence that Toomey actually went to chief counsel's office. She testified, there's no email, there's no memorandum. But that's not the protected disclosure. Right, but the protected... And that's the only thing you have that preceded the suggestion that she get some training. And there seem to be a lot of the reasons in the record why she might need that training. And training, like I said, in and of itself, like we see adverse actions for people getting fired, getting suspended, training is not the same as those things. But Judge Moore, there's a couple of intervening acts before the remedial training, not refresher training. There is, two weeks after Toomey is lectured by OPR about having to report this, my client is sent to the WDO to an office. You say lectured by OPR about having to report this. I don't see anything in this record where OPR lectured your client. When you say it like that, it's as though she were reprimanded for not handling it right. Where in this record does it indicate that OPR somehow took action against Ms. Harris? You are completely overstating it. You've got a terrific set of facts. If you overstate them, you lose all credibility. I'm not trying to overstate the facts. I'm trying to lay a factual scenario where it does... That my client's reporting of the incident, my client says this is a violation of law. And she tells Toomey to do something about it. The issue is whether Toomey, in getting that disclosure, decides that she's upset with my client and takes action against her. And the first action that Toomey takes is to immediately transfer her to an office that hasn't been used in 12 years, that doesn't have a computer, that's been flooded, and is miles away from where she's supposed to test. That happens within two weeks of this disclosure. And so focus... Let me get this straight. You actually think, because the board makes fact findings, they didn't make this fact finding, you think it's reasonable to believe that your client goes to her supervisor and says, oh my God, I just had an admission from someone applying for a job that they are thinking of trying to have sex with their toddler. We have to report this. And you think her boss's reaction was to take an action against her? It defies credibility to think that when they had an actual admission of this and she is simply reporting it and saying we got to report this up the chain, which the boss then immediately did, that that would be a protected disclosure that would cause them to want to take action against her. And the board found there was no evidence to support that. And I'm really struggling with how anyone could believe that that would be the set of facts. Because the testimony was in the record, that she did more than just ask Toomey. She went to Toomey and McCaw and said, have you reported it to OPR? That's what she actually said. When did she do that? Was that before or after the training? After the chief counsel call. After the training date. No, no, not after training. You're claiming the adverse action was in part the training. No, I'm claiming that there was a whole series of adverse actions that began with the transfer to the WDO, continued through the false calling of countermeasures where there was no statistical evidence. Was she transferred out to the place with the flood before or after she complained about it not being reported to OPR? After, after. Before, but no, no. She went to Toomey. She told Toomey to report it. Toomey did report it. Toomey came back and told her even what the CCO said. And then she said it has to be reported to OPR. And she went and talked to Kevin Gaddy after that point. And Gaddy must have told OPR because OPR then told Toomey, you should have reported it to us. So my client wasn't satisfied with the chief counsel's response because the chief counsel's response was vague. It didn't address the issue. And my client felt that you have to actually report this to law enforcement, which is in the end what OPR actually did. And so I think what's missing in the factual scenario is that there is a follow-up. She goes and she says, look, you got to go to OPR. And she can't go to OPR herself because Toomey says you can't. Toomey never told her she couldn't go to OPR. There's nothing in this record, not even by your client, saying that. Toomey said. Wait, did you just misstate something? No, Toomey said. Where, show me where in the record. Show me where in the record. I would have to do a 28-J. Your client said. Toomey said to her, we can't do anything about thoughts. And if you report this and make a position out of this, you could get sued. That's what Toomey told her. It wasn't just that I went to chief counsel. She said, not only can we not do anything about it, you can get in trouble if you push this. My client did push it. She went and talked to Gaddy after that conversation. I think I heard you say that OPR did report this examinee to law enforcement. Yes. Can you tell me where that is in the record? I believe that that was testified to by Ms. Harris, that they followed up with the Virginia State Police. And it was referenced by Toomey herself. Can you tell me a page number where I could find it? Your Honor, I would have to dig through an 800-page record.  Well, on rebuttal, hopefully.  So I think the thing is, is that the thing that's trouble... You're running out of time. What about the car factors? So on the car factors... Why isn't it just substantial evidence, the evaluation of the car factors? Because the judge discounted evidence. She didn't even acknowledge evidence. There's no reference. The most glaring evidence, there's two evidence that things could go, I think. And this is where the countermeasure... The decision looks pretty thorough, weighing a lot of different competing testimony and finding certain witnesses testifying in a very credible way. I mean, it makes it very hard for you to try to re-litigate everything up here at the appellate level. I agree, but I'm not trying to re-litigate. I'm trying to look at a record where the judge never allowed... She never allowed the agency, required the agency or had evidence of the statistical proof to the significant factor, which led to the agency's actions, which was the countermeasure calls. She didn't push the agency on the issue with whether or not those were actually confirmed. And the second thing that she didn't do is, I looked through this record and you know whose testimony is barely referenced?  Barnes goes to the DIA. He's in charge of the whole polygraph program for the government. And his testimony is never referenced. It's never referenced as a comparator. It's never referenced that he supports her underlying claims. It's never referenced that he supported her claims that they were being pressured on countermeasures, that they were being pressured on legacy candidates, which the IG found. So that doesn't appear in her record. Nor in her record is there the central issue is the fundamental issue that I see as a problem for the judges as I pressed in the examination, and I'm almost out of time. But this, I think, is the most significant thing if you're going to look at something. Why is it that she called countermeasures? That's the remedial problem. I mean, the elephant in the room here is the CAR Factor 1 and the strong reason to remove her from being a polygraph examiner. I mean, and I think the evidence is strong there in such a way that we can't overturn the finding on CAR Factor 1, that there was strong evidence to take the actions that the agency took. I'm not sure what that strong evidence was because... The conversation that she had with an outsider, are you surprised about what we're talking about here as to what the CAR Factor 1 evidence was? I am when Mr. Barnes testified that he had similar conversations with Joe Collins, Dan Holcomb, Lamberth, Toomey herself, James Lee, Richard Alexander. Well, are you saying that the DEA had rules that's totally permissible, like in the middle of an examination for a polygraph examiner to have these kinds of conversations accusing a person of lying to a person that's outside the DEA? I'm just asking you a question. What is the rule on that? Is it permissible to share that kind of information with someone outside the DEA? What I'm saying is that... What is the rule? There is no rule. So it's okay to do it? There is no rule one way or the other. Barnes testified that it was a common practice for him to talk to these supervisors, including the people that brought the action. But to talk to people, yes, but to actually share this kind of confidential information? Charts, examinees' responses. Wait, you think it's okay? You think there is no rule that says that the DEA person administering a polygraph is not permitted to reveal the confidential employee responses to people not even employed by DEA? You think she can share in the midst of a polygraph the ongoing dialogue that she's having with this employee with non-DEA personnel? Well, I think that the evidence shows that he was in a position at DIA where he was responsible for imposing the NCAA standards. NCCA, I knew I was going to do that. NCCA standards on... Is there not a rule that says DEA agents are not allowed to share the information they glean in a polygraph from a prospective employee with outside of the agency personnel? Well, if there is such a rule, which I did not see actually cited, why didn't all these other people get punished as a comparator? And my clerks has pointed out on Blue Brief, page 33, your client testified that the reason she didn't report it to OPR is because she thought it needed to be sent up the chain of command. She never says anything about what you claimed earlier about being told she was not allowed to report it. I think she testified to that fact, Your Honor, and I could pull it out of the record and I could certainly supplement it with a filing, but she did testify that she, in fact, went to Kevin Gaddy and went back to Toomey and to McCaw and said it needs to go to OPR. You earlier tried to claim she was told she was not allowed. She was. She was advised that she could not report the matter up because it had gone to chief counsel and Toomey said the chief counsel said you could get into trouble if you push it. There is no evidence of that in this record that you presented to us. All right. I will look for my rebuttal. Sure. Absolutely. All right. Good morning, Your Honors, and may it please the court. I think it's noteworthy here that Ms. Harris was transferred to a different DEA unit. She wasn't terminated, and all of this occurred after a persistent deficient performance, after she had taken a training course, and after several quality control reviews of her work demonstrated that she still was conducting her polygraph examinations improperly. She also admits that as the administrative judge. Do you think that it's too harsh, though, to have taken these actions against her under the circumstances? I mean, she was presented with sort of unconscionable information, the kind of information that would make any normal human feel absolutely compelled that something had to be done, right? I mean, wouldn't you agree? I would agree with that. Yeah. I mean, there's just no... I mean, it's just beyond my capacity if I heard somebody say that. And I mean, yeah, she probably made a mistake reaching out to Barnes and trying to talk to him about how frustrated she was about stuff. But I mean, under these circumstances, isn't it just maybe a little... Isn't the action that was taken against her maybe a little too much, given all of that? Well, she has a burden of proof here with respect to demonstrating that she made a protected disclosure under the Whistleblower Protection Act. And I think LaChance is particularly instructive in saying that even if she had consulted with other employees, that's just not sufficient for the objective belief standard in terms of proving that this should be a protected disclosure. I mean, I certainly feel her pain. I understand her frustration. She went to her boss, said, report it to one of these two people, and only one of these two. And the boss did that. I have to say the CCO's response about do nothing would have shocked my conscience, right? I mean, I would have been like, what do you mean do nothing? How do we do nothing when somebody says that they're having these kinds of thoughts? How do we not do something to protect that child? You know, like the response that Toomey got from the CCO, which I believe, you know, I trust the AJ's assessments of credibility, but that response is just sort of patently absurd to me. Well, what occurred here is that when Ms. Harris took this information to her supervisor, Ms. Toomey, Ms. Toomey did do something. Well, yeah, I agree Ms. Toomey did something, but what I'm bothered by is CCO's response to Ms. Toomey. Nope, you can't do anything about it. Don't do anything about it. Like, you got somebody saying they want to do something really bad to a three-year-old at home. And your Honor, from- How could the chief legal counsel shame on that person? It's a horrible thing to even think about, but the facts here are that this examinee said that he or she was having thoughts about doing something. And objectively speaking, that's not a crime. So there were steps that were taken. And at some point, it got to a point where they decided this could not be reported further. There is no evidence in the record that OPR then consulted or recommended or referred this matter to law enforcement. In fact- That was a misstatement of the record? I believe that's right, Your Honor. She's probably going to lose because of not being able to prove a protected disclosure, but the woman deserves a medal for the fact that she fought as hard as she thought she could for this child. And maybe there is lots of proof in here that she wasn't doing the best job as a polygraph examiner, and that therefore, you know, you've satisfied your burden of showing action would have been taken no matter what. But it makes me sad because, you know, she- I understand Your Honor's concerns. And I'm not trying to discount them. It's just that on this record, and whether Ms. Harris was able to prove her burden is just lacking. And Ms. Harris could have reported it to OPR herself. There's also no evidence in the record that she was advised not to. She could have even reported it to law enforcement if she felt- I know. There's nothing in this record that was presented to us that says what he was claiming. I know that. Because as you can tell, I've paid a lot of attention to this record. Thank you. On CAR Factor 3, their argument is that the government conceded it was neutral, and then the administrative judge said it actually favors the government. The page they cited for your admission, supposedly, of neutrality was 5109, which is not in our appendix. Is there- do you acknowledge that the government conceded CAR Factor 3 is neutral? What's your position on Factor 3? Your Honor, the government did not concede that. There were examples that the administrative judge directly addressed at page- appendix page 48 to 49. Those examples included Toomey's testimony, which is at appendix page 4708 through 09, and also at appendix page 4746, where they had sent another employee to refresher training. There was another employee who they had removed for performance. Right, I did see all that, but so if we had page 5109, it would not show a government concession on Factor 3. Is that right? I don't believe so, Your Honor. I did not- that was not our position.  Okay, anything further, Ms. Moses? No, Your Honor. If the Court has no further questions, we ask that the Court affirm the Board's decision. Thank you. Just very briefly, Your Honor. I haven't found the subsequent report where my client was advised by OPR that they followed up with Virginia State Police. Here is the statement that my client made. Did you report this to any law enforcement or local child protective services? This is on cross-examination, but- Can you tell me on what page- Appendix 46- appendix 4600. 4600? Yes. And the answer- Hold on, please. Let me just get there. Okay. 4600. Okay, so there's four pages here. Is there a particular one? 358, 360, something like- 361. 361. Okay. No, I reported it to my chain of command and I told Mary that following week when, you know, Mary Siktirski, according to her email, said no and you will bring harm to the agency and yourself. And then I re-engaged with Vanessa. We have to contact OPR. Well, they are trying to oppress a crime. So I then engaged with Mary. I think Wednesday said you have to call OPR. That occurred after. After she was told about Tierski. My client clearly testified to that fact. She made it very clear that she was following up and pressing the issue. And then after she did that, OPR contacted Toomey and said, where is the DEA 6 on this that shows the conversation you should have reported us to? All that occurred well before she was transferred. All that occurred well before the retaliation began. So the triggering event for this was her pressing the issue. And so that is in the record. I didn't make it up. I didn't misstate it. It is right here. That's what my client testified. I think you absolutely overstated it. I don't think that statement is consistent. You can go back and listen to your oral argument. You overstated it, but go ahead. I believe it's very clear that she said that she pressed the issue. And I believe she also testified that after she had the conversation with Tierski, she talked to Kevin Gaddy. I think that was on the next page. She goes into her discussions with Gaddy. Yeah, but the ALJ who heard all this found Mr. Toomey credible or Ms. Toomey credible and didn't find that there was any evidence that Ms. Toomey would have, you know, had a negative reaction to this being pressed. But that's why, and I'll just finish with this. That's why the transfer that occurs right after this conversation and right after it's reported. It was because of construction. The record shows. There was no construction. Dave Lamberts, Mr. Barnes said there wasn't construction going on. My client testified it didn't affect anything. She testified additional people were going back to that station. She testified that it was inconsistent with what she was supposed to do and she couldn't do the testing there. Testify that nobody had been sent to WTCR 12 years. There are findings throughout this that would have to be proven to be not supported by substantial evidence. Well, I agree, Your Honor. But if the judge got the idea of the protective disclosure wrong, it would get remanded to evaluate the evidence in light of that protected disclosure. That's our position. That's why we say there is other evidence to show that the judge did not take into account substantial evidence. She didn't ever prove the agency to show that the underlying conduct that got her not not refresher training, but negative remedial training was based upon actual countermeasures that she was miscalling rather than being supported. So that tends to show me that it was the countermeasures she was calling that led to her discord with the agency and that it was her pressing to me on this pedophile matter and pressing McCall on this pedophile matter that got them to be angry with her. And within two weeks of that disclosure, they sent her to a distant location. And the gulag treatment is a typical response to whistleblower activity. It's to send someone out. And the comparatives the agency cites, the agency itself said there was a neutral one. They had no comparatives. The judge added the comparatives. The agency never raised them. And so I think the record does show that my client made a protective disclosure and the chain of events that follows was in reprisal. So I respectfully disagree with the idea that the judge got it right because the evidence shows that she did not. And we think that the agency has to show by clear and convincing evidence they would have done this anyhow. I think you have to find that she made a protective disclosure that has to be sent back to remand and to determine whether this opinion is consistent with that. Thank you, Your Honor.